THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT MARTINEZ, Defendant-Appellant.

First District (2nd Division)   No. 76-1365

Opinion filed June 13, 1978.

Sam Adam, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Richard Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Robert Martinez, was charged by indictment with the offenses of conspiracy, armed robbery, aggravated kidnapping and murder in connection with the October 1, 1972 holdup of the Swedish Manor Restaurant in Hillside, Illinois and the subsequent abduction and death of Hillside Police Officer Anthony Raymond. (Ill. Rev. Stat. 1971, ch. 38, pars. 8—2, 9—1, 10—2, 18—2.) That count of the indictment charging armed robbery was severed and a *nolle prosequi* was entered thereon. Upon a jury trial defendant was found to be guilty of the remaining counts. Judgment was entered on the verdicts and defendant was sentenced to serve a term of confinement of 75-150 years in the Illinois State Penitentiary.

From entry of the judgment of conviction defendant appeals contending: (1) that the trial court erred in permitting the State to elicit

testimony establishing that defendant engaged in negotiations with the State's Attorney's office regarding the possibility of obtaining immunity from prosecution for the instant offenses; (2) that the trial court abused its discretion in denying defendant's motion to suppress prosecutorial use of a prior conviction to impeach defendant; (3) that the prosecution's closing argument was improper and served to deny defendant a fair trial; (4) that the trial court improperly refused to tender certain defense instructions to the jury; and (5) that the evidence properly adduced at trial was not sufficient to establish defendant's guilt beyond a reasonable doubt.

A review of such evidence reveals that at approximately 10 p.m. on October 1, 1972, the Swedish Manor Restaurant in Hillside, Illinois, was robbed by two masked gunmen. Lawrence Thomas, the owner of the restaurant, described his assailant as a male, 5'8" tall, well-built, broad shouldered with narrow hips, wearing a Levi type jacket, faded blue denim trousers, a multicolored hat and mossy colored shoes. Manuel Flores, an employee, described the other assailant as a male, 5'7" tall, of slim build, weighing approximately 150 pounds and having light hair. After taking $5000 from the restaurant safe and disabling the telephones, the gunmen fled.

The owner's son, Randall Thomas, testified that shortly before 10 p.m. on the date in question he observed a dark colored, full-size car "like an Impala" parked in a section of the restaurant lot ordinarily used by employees. Jack Pryor and Timothy Hinsdale testified that at approximately 9:55 p.m. they observed a burgundy colored Cadillac parked on Oak Ridge Avenue in Hillside, Illinois, and remarked that such expensive cars were uncommon in the area. When Pryor and Hinsdale left the neighborhood 5 or 10 minutes later the Cadillac was still parked on the street. Shortly thereafter, William Furry and Laura Klemm had occasion to drive on Oak Ridge Avenue in the vicinity where Pryor and Hinsdale had observed the Cadillac. Furry observed a blue Chevrolet which he initially mistook for an acquaintance's Impala. It was demonstrated that the Chevrolet was now parked where the Cadillac had previously been located and that between 10 and 10:13 p.m. the Cadillac had been moved. Subsequent investigation revealed that the blue Chevrolet was a stolen vehicle.

Also shortly after 10 p.m., a late model, black over red Cadillac automobile bearing license plates with the letters "LL" was observed in the vicinity of Harrison Street and Mannheim Road in Hillside, Illinois. Its operator negotiated an illegal turn in order to gain access to the Eisenhower Expressway at Mannheim Road. A marked Hillside police car, driven by Officer Anthony Raymond, gave pursuit and curbed the Cadillac. Two men, matching the description of the individuals who had robbed the Swedish Manor Restaurant were observed in the Cadillac. At

trial, it was established that a 1969, black over burgundy, two-door Cadillac with license plate number "LL 781" was registered to the wife of Silas Fletcher. Several minutes later, police assistance units arrived on the scene to discover Officer Raymond's abandoned squad car.

The State's principal witness, Vincent McCabe, testified that he and defendant, Robert Martinez, were close friends and partners in an illegal book-making operation. According to McCabe, he spoke to defendant on the evening of October 2, 1972, and at that time defendant related his complicity in the disappearance of Officer Raymond. McCabe stated that defendant had informed him that he, Silas Fletcher and one Jessie Millard drove to the restaurant but that defendant waited in the rear seat while Fletcher and Millard entered the restaurant. Fletcher and Millard returned five minutes later and they drove off to pick up Fletcher's car which was subsequently curbed by Officer Raymond. Fletcher abducted the officer at gunpoint and threw him into the back seat of the car where defendant handcuffed him. Officer Raymond begged for his life but was driven to Fletcher's house where he was blindfolded and strangled with a guitar string. The officer's body was stuffed into a barrel where Fletcher administered what defendant characterized as a "coup de grace" by stabbing the officer in the back. Defendant, Fletcher and Millard carried the barrel to the back of Fletcher's jeep where they loaded the makeshift coffin and departed for a farm in Wisconsin owned by Fletcher's sister and her husband, Mary Ann and James Ehmann.

McCabe further related that enroute, the group encountered mechanical difficulty and were inadvertently assisted by a State trooper who testified that he encountered a disabled jeep on the Interstate I59—1—90 and saw three men in it and a 55-gallon drum in the back. He radioed his dispatcher to send a tow and when he passed the area 10 minutes later he saw the jeep was gone, but a license check established the owner as Silas Fletcher. McCabe testified that defendant admitted that they drove to a wooded area near Fletcher's sister's home and, while it was still dark, dug a grave, dumped Officer Raymond's body out of the barrel and into the grave and replaced the drum in the jeep. After the grave had been closed and commenting that it would be well fertilized, Fletcher pulled a young sapling from the ground and so marked Officer Raymond's grave. The group then drove to the Ehmann home for breakfast.

According to McCabe, he agreed to provide an alibi for defendant in order to exculpate him from complicity in the murder. On February 8, 1974, and June 24, 1974, McCabe appeared before a Cook County grand jury and lied about defendant's involvement in the abduction and murder of Officer Raymond. In addition to the aforementioned grand jury appearances, McCabe related that on three other occasions in 1974 he lied

to law enforcement officials when questioned about defendant's participation in the homicide. McCabe had received assurances of immunity from prosecution prior to his February 8, 1974, grand jury appearance and again on June 27, 1974. McCabe further testified that he had been receiving $1200 per month from the State of Illinois for living expenses after it had become necessary to relocate for security purposes. For the portion of the year in which his children were enrolled in private schools, McCabe received $825 per month from the Federal Witness Protection Program. At the time of trial, McCabe's government subsidies totaled in excess of $28,000.

McCabe explained that he had given perjured testimony because of his friendship for defendant and to stall for time so that he, McCabe, might negotiate with officials of the State of Illinois for immunity from prosecution for defendant in return for defendant's testimony against Silas Fletcher. According to McCabe, defendant was offered such immunity but rejected it. McCabe indicated that he finally told the truth to law enforcement officials because his home had been burglarized and he feared for his family's safety. McCabe stated that he had informed one Antoinette Jackson and his attorney, George Naze, about defendant's participation in the murder before any money had been received from the government. Neither Jackson nor Naze testified at trial.

On August 8, 1973, approximately 10 months after his disappearance, Officer Raymond's body was discovered buried in a wooded area adjacent to the Ehmann property in Rhinelander, Wisconsin. Raymond's hands were still handcuffed behind his back and his legs were bent up behind him. Post-mortem examination revealed that the officer had died as a result of four stab wounds in the back. Laboratory analysis of the bloodstains found on the officer's shirt indicated that the body was upright when initially wounded but had been placed in a horizontal position for two or three minutes before being returned to the vertical, at which time the pattern of blood flow abruptly stopped due to pressure externally applied such as an arm drawn behind the back.

It was established that at approximately midnight on October 1, 1972, Officer Randall Rushing of the Illinois State Police had occasion to assist three individuals in a 1965 white jeep which had mechanical difficulties. Officer Rushing testified that he observed a 55 gallon drum standing on end in the rear of the jeep. The vehicle bore license plate number "WG286" registered to Silas Fletcher.

Mary Ann Ehmann testified that her brother, Silas Fletcher, and two of his friends, introduced to her as Jessie Millard and Bobby Martinez, came to her home at approximately 6:30 a.m. on October 2, 1972, in Fletcher's white jeep. She identified defendant as the man who was introduced to her as Bobby Martinez that morning. Her brother told her that they had

been drinking all night but she failed to detect the odor of alcohol on their persons. After they ate breakfast, Fletcher telephoned his wife, and, according to Ehmann, told her that they "got five." She further related that in endeavoring to be a good hostess she engaged defendant in conversation and he told her he was of Mexican descent, from Texas, was a barber, divorced, had a child and that his former wife lived outside Chicago. She identified a phone bill that corroborated the testimony regarding the phone call made by Fletcher to his wife.

James Ehmann also testified that Silas Fletcher and two men introduced as Jessie Millard and Bobby Martinez came to his home on the morning of October 2, 1972. Fletcher was wearing blue levi trousers, a blue jacket with imitation sheepskin lining and suede shoes. James Ehmann identified photographs of clothing which he subsequently found behind a wood pile on his property as being the type worn by Silas Fletcher on October 2, 1972. According to Ehmann, he also observed Fletcher in the process of washing blood out of the back of the jeep. Fletcher became irritated when asked about the blood.

On cross-examination, Ehmann admitted that he had told no one about seeing the blood on Fletcher's jeep until almost one year after the event and then in response to questioning by police officers. Ehmann also stated that when shown photographs of Fletcher, Millard and Martinez he was unable to identify Martinez by this means. Ehmann also indicated that he had previously been warned by Fletcher that "talkers don't live." Martinez was arrested on June 13, 1974.

Defendant adduced no substantive evidence in his own behalf and did not testify.

Defendant initially contends that the evidence adduced at trial was insufficient to establish his guilt beyond a reasonable doubt. In particular, defendant asserts that the testimony of James Ehmann and Vincent McCabe was inherently incredible and unworthy of belief.

■■ It is well settled that the weight of evidence and the credibility of witnesses are matters peculiarly within the province of the jury as trier of fact. (*People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) Illinois courts of review will not reverse a conviction where the evidence is not so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) Where the trier of fact renders a decision based upon credible and substantial evidence which is sufficient to convict, the verdict may not be lightly set aside merely because the trier of fact chose to believe the testimony presented by the State. *People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453.

While the testimony of an admitted perjurer must be considered with great circumspection, we note that Vincent McCabe's testimony considering the gruesome details of the October 1, 1972, abduction and

murder of Officer Raymond was corroborated in significant detail by the testimony of several independent witnesses and the physical evidence described at trial. Therefore, it cannot be said, as a matter of law, that McCabe's testimony was inherently incredible and unworthy of belief even when viewed in the context of his background and his pattern of deceit. Similarly, the testimony of James Ehmann, establishing defendant's presence, in the company of Silas Fletcher and Jessie Millard, in Rhinelander, Wisconsin, on October 2, 1972, was amply corroborated by the testimony of Fletcher's sister, Mary Ann Ehmann.

■■ Considered as a whole, the evidence adduced by the State clearly defined the means, opportunity and motive for the Raymond homicide and serves to establish defendant's role therein. Such evidence bears few inconsistencies and none sufficient to raise a reasonable doubt of defendant's guilt.

Defendant next contends that he was denied due process of law when the prosecution disclosed to the jury details of Vincent McCabe's allegedly successful attempts to negotiate for defendant's immunity from prosecution.

■■ It would, of course, be prejudicial to a defendant for the jury to be informed of pretrial immunity negotiations. When the jury is apprised of any such bargaining it might improperly conclude that the defendant must be guilty based on the suspicion that an innocent defendant would not seek to bargain with the State's Attorney. (*People v. Jackson* (1974), 24 Ill. App. 3d 700, 321 N.E.2d 420.) The State's attempt to distinguish "negotiations for immunity from prosecution" from "bargaining for a plea of guilty in return for a reduced charge or sentence" must be rejected as being wholly specious. Their contention that an attempt to negotiate immunity from prosecution somehow provides an indicia of an accused's innocence is meritless. See *People v. Koba* (1977), 55 Ill. App. 3d 298, 371 N.E.2d 1.

■■ However, where, as in this case, defendant acquiesces in the admission of evidence, even though the admission of such evidence was improper, he will not be heard to complain. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389.) Defendant made a tactical decision as to the admission of testimony and defendant's argument to the jury concerning McCabe's immunity negotiations in an attempt to disparage McCabe's testimony. It was defendant's contention at trial that not only was it highly improbable that the State would ever offer immunity to a man charged with the kidnapping and murder of a police officer, but further, that if the defendant were actually guilty he would not reject such an offer. It would be incongruous to permit defendant to employ a trial tactic such as that involved in the instant case, determine by an adverse verdict that the stratagem was unsuccessful, and then claim that the trial court committed

reversible error by not preventing defendant from employing that trial strategy.

Defendant also contends that the trial court abused its discretion in denying defendant's motion to suppress evidence of defendant's prior conviction for armed robbery. Defendant bases this assertion upon the fact that the judgment of conviction for that offense was entered 9½ years prior to the instant trial and that the instant case also related to an armed robbery.

■■ ■ The decision as to whether a previous conviction may be disclosed for impeachment purposes is one to be weighed and determined by the trial court based upon the circumstances presented. The trial court must be given considerable latitude in making this determination. (*People v. Spicer* (1976), 44 Ill. App. 3d 200, 358 N.E.2d 104.) Generally speaking, evidence of a prior conviction is admissible unless it is determined that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. A number of factors are to be considered when a court weighs the probative and prejudicial values of the prior convictions including: (1) the nature of the prior crimes; (2) the length of the defendant's criminal record; (3) the defendant's age; (4) the likelihood that the defendant would not testify if his motion to exclude his prior conviction was denied; (5) the nearness or remoteness of the prior crimes; (6) the defendant's subsequent career; and, (7) whether the prior crime was similar to the one charged. *People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.

■■ ■ In the instant case, defendant did not stand trial on a charge of armed robbery although the jury was apprised of the fact that an armed robbery had occurred prior to the abduction and murder of Officer Raymond. In any case, the fact that the prior conviction is for a crime which is the same as the offense now charged does not mandate that it be suppressed. (*People v. Clark* (1971), 3 Ill. App. 3d 196, 278 N.E.2d 511.) A prior conviction for robbery, although involving violence, has been found to relate directly to a defendant's credibility and veracity as a witness. (*People v. Ridley* (1975), 25 Ill. App. 3d 596, 323 N.E.2d 577.) While the judgment of conviction was entered 9½ years prior to trial, defendant was released from incarceration 7½ years prior to the instant trial and the latter date is relevant to this determination. (*People v. Austin* (1976), 37 Ill. App. 3d 569, 346 N.E.2d 166.) Although defendant strenuously argues before this court that the trial court's decision was instrumental in his decision not to testify, defense counsel did not apprise the trial court that *but for* the court's adverse decision defendant would have testified. We find that the trial court properly exercised his discretion in denying defendant's motion to suppress evidence of his prior criminal record since its probative value was not outweighed by any allegedly prejudicial impact.

Defendant next contends that the trial court erred in failing to grant defendant a mistrial predicated upon what defendant asserts to be an improper and prejudicial closing argument by the prosecution to the jury. Defendant relies upon two instances of alleged misconduct.

First, defendant maintains that the prosecution improperly shifted the burden of proof when, in an effort to bolster the credibility of Vincent McCabe, the prosecution noted that McCabe had testified that he told the "complete truth" about defendant's complicity in the murder to Antoinette Jackson and George Naze prior to McCabe's receipt of government support; that McCabe's testimony on this point was uncontradicted; and that Naze and Jackson were available to defendant to call as witnesses.

■■ An accused has no duty to produce a witness who is equally accessible to the State. (*People v. Nelson* (1974), 16 Ill. App. 3d 976, 307 N.E.2d 165.) To permit such comments conflicts with the doctrine of presumption of innocence and places a burden on the accused which the law does not require. However, it is not error for the prosecution to reply to a question propounded by defense counsel and, where counsel for the accused has asked why the State did not produce certain witnesses, it is proper for the prosecutor to ask defendant's counsel why he did not bring in the same witnesses, so long as the remarks are properly limited to a reply. (*People v. Wheeler* (1955), 5 Ill. 2d 474, 126 N.E.2d 228; *People v. Izzo* (1958), 14 Ill. 2d 203, 151 N.E.2d 329.) We find that the prosecutor's comments in the instant case were in the nature of such a response.

■■ ■ Second, defendant correctly notes that the prosecution improperly referred to defendant as a "blood-crazed animal" which "hovored over the grave of Officer Raymond." (*People v. Mackey* (1964), 30 Ill. 2d 190, 195 N.E.2d 636.) Defendant's prompt objection and the trial court's action in sustaining the objection served to cure the error complained of. (See *People v. Howard* (1976), 42 Ill. App. 3d 81, 355 N.E.2d 543.) In any case, in view of the evidence adduced at trial, the prosecutor's comment only served to state the obvious and defendant was not prejudiced thereby.

■■ Defendant finally calls attention to the instructions tendered to the jury and asserts that the trial court prejudiced defendant by refusing to tender the following defense instruction:

> "The Court instructs the jury that when determining the evidentiary worth of the testimony of an admitted perjurer, the jury must not judge the testimony as it would that of another witness. The jury must look upon the testimony of an admitted perjurer with great suspicion and act upon it with great caution."

Two additional instructions which provide variations on this theme were also rejected by the trial court.

Again, the proposed instructions serve only to state the obvious. The trial court instructed the jury in accord with the Illinois Pattern Jury Instructions that:

"You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, and interest, bias or prejudice he may have, and the reasonableness of his testimony considered in light of all the evidence in the case"

and further,

"Evidence that on some former occasion a witness made a statement inconsistent with his testimony in this case, may be considered by you in deciding the weight to be given to the testimony of that witness."

These instructions sufficiently alerted the jury to the caution necessary in weighing the testimony of a witness like Vincent McCabe. (See *United States v. Polizzi* (9th Cir. 1974), 500 F.2d 856, 878.) No error was committed in this regard.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and BROWN, JJ., concur.